Our final case for today, now this afternoon, is United States v. Jacob Lickers. Mr. Rosen. Thank you, Your Honor. May it please the Court, Mark Rosen appears on behalf of the appellant, Jacob Lickers. It's pretty clear, I think, from the law, that the instant Mr. Lickers gave his driver's license over to the officers, a seizure had occurred. I don't think there's any doubt about that under the law. I think the State Court was right about that. I think under Huff v. Reitkamp, as well as the other case started, the village of Palatine, a traffic stop of that nature mandates that there is a seizure. He has been seized at that point. Mr. Rosen, back up one iteration in the encounter in the park. Was it okay for the police to approach the car and, among other things, ask Mr. Lickers for his driver's license? I don't even think that was okay. What authority do you rely upon for that? Because that voluntary encounter, if it was okay, it's hard to say. But once they have the driver's license in their hand, they kind of trapped themselves, right? In other words, they were okay to ask for the driver's license, but once they got it, he was no longer free to go, and so they thereby seized him. I mean, that doesn't really hold together. Well, except for the fact that even if he had given the license, he still couldn't leave. He didn't have a driver's license, so he couldn't drive away because it would have been a traffic stop. He could have walked off. I mean, I actually had a question about that initial encounter, too, because a way you could look at this case, which I believe may be the way Chief Judge Darrow looked at it, is that the police can walk up to the car, consensual encounter. You can say, I don't feel like talking to you. You can say anything. They've seen things that strike them as odd, and they begin to develop reasonable suspicion, so they can at least ask for the driver's license. Maybe they can ask for the driver's license without it, but by the time they ask for the driver's license, there are things that they think are strange. They think he might be tweaking. They think he might be doing. They don't know what he's doing, but he's behaving in an odd way. The car is parked in an odd place. Then they get the driver's license, and then, of course, once they're worried about the towel, maybe he has a gun under it, maybe something else, but as soon as he moves the towel, then that's that. Correct, but the thing is that once they approach him, the only reason they approach him, and they testified to this clearly at the hearing, it was just odd. There was no crime being committed. He testified to that on cross-examination even when he took the driver's license. He said there's no crime being committed. There's nothing there. I just need to check things out, and frankly, the more he got into this encounter, the less the reasonable suspicion became because the tweaking, he said, this guy doesn't want drugs. The tweaking is gone, so that's basically not there anymore. He's just a little nervous, and this court has said in Huff v. Reichert, nervousness isn't enough. These guys were in plain… I'm sorry. You can move on to your next point, but I was just going to say it just seems odd when the cops walked up to him and said, you know, they first asked about pills, said, hey, can we see your driver's license? He was free to say, no, I'm taking off. I'm not up to anything. I'm leaving. Started the car, drove away. But under Nobles, once they were in a position of power because they had both sides blocked off, Mariko was in the back of the car in a power position, but they had blocked the car. Once he gave the driver's license over, and they basically showed their credentials, and they basically made it a position of power for him to not be able to have the choice. Once the client gave the driver's license, McVeigh took a half a step, and Mariko ordered him, said, keep your hands up. Basically, this was a whole power thing. They knew that they had seized him and that he knew he'd been seized. Now, he may have been a little nervous, but nervousness, as I've indicated, isn't enough. But maybe he was nervous because these guys, two guys come up to him, basically show him some fake ID. Maybe they're thieves. Maybe they're drug dealers. He doesn't know that. Maybe they are. So the nervousness doesn't count. There really isn't much else, anything else that warrants them even asking him for the driver's license. But there's no law that I can think of, to get back to Judge Scudder's first point, that says automatically as a matter of law, as soon as you give your driver's license to a police officer, you're seized. I mean, most people at some point or another have been stopped on the road. Maybe they were speeding. Maybe they were doing something. You give your license to the police. That's always a seizure? Well, I think under the detention, once a traffic violation where there's a stop, under this court's law that I cited in my briefs says that that is a seizure because once you give the driver's license, the person cannot, first of all, Mr. Lickers could not get out of the car and move because McVeigh was blocking it, but once he can't even drive the car away because he doesn't have a license because that's a traffic violation. You can't drive without a violation. So he is seized at that point in time. He cannot move. They know it. The cops know it, and he knows it. And so basically that's when … The district judge didn't make that determination, though, did she? No. Did she make the factual finding that he couldn't get out of the car at that point? I don't remember if she made that actual determination that she could or couldn't. But the facts of the matter is that McVeigh had blocked that door. He was standing right by the door, and he took maybe a half a step back. So technically, factually, he had blocked that door, and then plus Maracle was in the back right behind on the driver's side, basically keeping an eye on things, riding shotguns, so to speak, and that is what factually happened. But what she says, she says it was a request, this is the driver's license, and she says the defendant demonstrated throughout the encounter that he understood he could say yes to some requests and he could say no to some, and so therefore that's good evidence. He knew he could say yes or no and that it was not, in fact, a seizure at the time that his driver's license was requested. So he could have said no. All right. Maybe he couldn't have, but the fact is that as Nobles indicated, they were in a position of power over him. I think a reasonable person would, they didn't draw their guns, but a reasonable person would believe that maybe he doesn't have the authority, but once they took the driver's license, he had been seized. Well, he did say no to them after the fact. He said no in response to the request to search. Correct. He did say no to that. So he knew he could say no. He knew he could say no to the request to search. And she also makes a finding, as I was indicating at the beginning, even if that was a seizure, that is to say giving the driver's license, she says, I think reasonable suspicion had been developed at that point, and she reviews the facts there. Well, we're disputing that reasonable suspicion had been developed up to the point, because Officer McVeigh himself said, all I was doing was wanting us to check it out. There was no reasonable suspicion that a crime had been committed. He himself testified to that once he even asked for the driver's license, that there was nothing there. There was just these people. He was just acting off. Mr. Rosen, I don't want to have your time run out on you. I want to get your reaction to one other issue in the case, and that is with respect to the search warrant. Both parties seem to want to put our attention on the state warrant. If I look at the state warrant, I actually think you've got a pretty good argument. Thank you. But we have a federal warrant as well on top of it. And so my question for you is what's the relevance of the federal warrant on top of it for purposes of the Leon good faith analysis? Well, as I indicated in my brief, the good faith has to be relied upon reasonably by police officers. I don't think either warrant was something that either officer could recommend. I know that, but focus on the federal warrant. Correct. You have an FBI agent that goes and seeks it, and it's issued. And then you have a forensic team at the FBI that looks at the devices. Okay? So at that point in time, you've had two different judges make a finding of probable cause. Is that a proper way to think about it if we go down the Leon road in your view, or is it not? We should think about it some other way. I think we should look at the warrant itself. I referred to the state warrant almost entirely, basically argued issues about, well, he's seen conflicting statements and argued a little jittery. And that, to my recollection, was basically almost an entire reliance upon the state warrant. So it's fruit of the poisonous tree somehow. The federal warrant couldn't, you couldn't just delete anything derived from the state warrant and still have the federal one? Well, I don't think the state warrant itself I don't think had probable cause. That's what I mean. So if you're looking at the federal warrant, is it so lacking once you get rid of anything that's a taint from the state warrant? Yes. I think so, too. I think so. All right. I'll let you save your final minute and we'll hear from Ms. Boyle. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Katherine Boyle on behalf of the United States. On the afternoon of September 3, 2015, the defendant Jacob Lickers sat in his car at Monmouth Park and masturbated while alternately looking at his lap, his Samsung Galaxy cell phone, and in the direction of a family with young children playing on a playground a short distance away. The district court correctly denied Mr. Lickers' motion to suppress because law enforcement officers had reasonable suspicion to detain Mr. Lickers in connection with this incident. But, you know, on the outside, you know, I'll grant you that his car is parked in kind of a careless way on the side of the road, not the side with the parking lot where somebody might have gone, and he's sitting inside the car, but certainly nobody in the park or at the playground could have seen anything. You really would have had to go right up next to the car. So what was he doing that really justifies the initiation of this police conduct? Well, Your Honor, I believe the relevant case law states that police officers may go up to an individual and ask questions without having any reasonable suspicion. So is it the towel? I mean, you know, so they go up to the car. They don't, you know, there's no gun in the seat. You know, there's nothing much there. They think he's weird. I mean, I think I'll, my sense of this record is that they think he's kind of odd. But being odd is not a federal crime or a state crime. Well, Your Honor, I think there's more than that. At the time the agents went up to the car and before he had handed the license to the officer, they had passed the car on three occasions, or they had seen the car on three occasions. On each of these occasions, Mr. Lickers is engaging in the exact same pattern of unusual behavior. He's looking from essentially the steering wheel or his lap to this family with young children to the passenger seat on which they would later see his cell phone. They also noted, as you correctly stated, his parking was odd. It's strange to pull over half on, half off the road when there's a parking lot available. And the implication here is that he wanted to be able to see the playground. What about the officer's testimony at the hearing that he didn't think he was engaging in any wrongdoing when he first approached the car? Yes, Your Honor. That testimony, reasonable suspicion doesn't require an officer to see somebody engaging in wrongdoing. They can just see suspicious behavior. And I believe at the hearing he actually did testify when asked that he believed it was possible Mr. Lickers was gearing up to commit some sort of crime. So the agent didn't need to testify at the hearing that he specifically saw something that he knew 100% was wrong. That sounds like wild speculation, though. I mean, they're there at this park because they have a project about drugs that they're working on, and there's some references he's tweaking. But you're talking about total speculation as opposed to the kind of concrete fact-based reasonable suspicion that might then lead us down. Once we've got the towel and the dog and everything, then we're fine. But it's getting up to that point that's tricky here. Well, Your Honor, I believe reasonable suspicion was increasing throughout this entire encounter. During that initial consensual encounter, reasonable suspicion wasn't needed prior to the time the license was handed to the officer. I think everybody agrees on that, even Mr. Lickers. And the government disputes whether reasonable suspicion was needed at the time the license was handed over. So I've discussed already how they've seen Mr. Lickers on three occasions. They've noticed his parking job. They've called in his license plate. Which all checks out. There's nothing wrong with the license plate. It's Colorado, right? No one says it's a stolen car. First they give him the phony name, but then when they call him by his own name, he's the person to whom the car is registered. Well, preliminarily the license plate checks out, but they're still concerned about what he's doing there. They're concerned about his behavior and his specific pattern of glances, particularly because it's not something they see just once. It's something they see three times. So when do you think reasonable suspicion attaches? I think reasonable suspicion attaches prior to the officer's request for Mr. Lickers' license. I think at that time, in addition to everything we've already discussed, the officers see a lap towel. They're thinking about whether he's concealing something. So as they're closer to the car before they ask for the license? Yes, Your Honor. Once they see the towel? Once they see the towel. And they also note at that point that he's repeatedly putting his hands underneath the towel, which is something that would be very concerning to law enforcement officers who are going up to a car. They don't know what's under there. They also then saw a cell phone on the passenger seat. And then while Mr. Lickers was supposedly nervous throughout the stop, officers noted that his nervousness escalated to the point of hyperventilation at the time they identified themselves as law enforcement. And while defense counsel is right that that is not enough by itself, that's not all they have here. So what about this talk that they know that it's possible on Craig's List that child pornography might be accessed, but it's certainly possible on Craig's List that it's adult pornography or it's something else entirely? Yes, Your Honor. I think here they're considering also the context of where Mr. Lickers is, though. He's in a public park. He's parked in this very strange spot that puts him within 70 to 75 yards of a playground where there's a family with young children. Here you can make an analogy. Let's say Mr. Lickers is parked outside of a school. I think in that situation officers would similarly be concerned, even if it is a place where other adults can be present. You go to a school because you are looking for children, and here you go right by a playground. Schools and public parks are a lot different, though. Go ahead. I'm sorry. And the question is, did the affidavit create a fair probability that evidence would be found on the phone? And given the statement that Craig's List contains adult and child pornography, and it's possible he was looking at child pornography, how does that create a fair probability that the evidence would be found on the phone? Well, it's not just the fact that Craig's List potentially contains child pornography. It also is this location, looking at this family of children right by a playground, and not looking at them on one occasion, looking at them as the officers go past the car on three different occasions. He's continuing to look back at this family as they're playing on the playground. Suppose we get to Leon. What's the right way to think about Leon, given that you have the federal warrant overlay? And the reason I ask the question that way is the federal warrant, it's complicated because the federal warrant has in it that paragraph 22 that talks about the video file that was uncovered as a result of the state search. Now, that, I mean, pushes it way over the edge as far as probable cause, just on the face of that warrant given the video file. But there's a little bit of taint there, or a lot of taint. But does the mere existence of the federal warrant, does that factor into the Leon analysis? The fact that it was issued? That's an interesting question, Your Honor. I would say no in this case because where you're looking, you're looking, in terms of who had good faith, you're looking at Officer McVeigh. You're looking at an affidavit authored by Officer McVeigh. The state search, or are you asking whether there was good faith for the federal warrant? I apologize. At the end of the day, if we're just saying, look, just assume for discussion purposes that both warrants lacked probable, or the first one lacked probable cause. You fall back on the argument, well, Leon kicks in. There's good faith. Okay, whose good faith are we talking about? Both at the state level and at the FBI level, at the federal level? Yes, Your Honor, you can look at that on two levels. First of all, you would be looking at whether Officer McVeigh had good faith for the state search warrant, which we believe he did. We don't think the defendant here has rebutted the presumption of Officer McVeigh's good faith. He hasn't shown that he was dishonest or reckless in making the warrant. He hasn't shown that the issuing magistrate judge abandoned his neutral and detached role. Who executed the state warrant? I believe the state warrant was executed by state officers, but I would want to double-check that. Was it Officer McVeigh, or was it the technical people on the phone? I would want to double-check that, Your Honor. McVeigh was on a drug squad, right? He was on the West Central Illinois Task Force. And I'm sorry, I didn't mean to interrupt. You were answering Judge Scudder's question about the impact of the federal warrant. Yes, and I also believe that there's not evidence here on the state warrant that it was so lacking in probable causes to render a belief in its existence entirely unreasonable. So can you stack Leon that way, that the state warrant squeaks through on Leon? It's good faith, which then means that the things seized under the state warrant, including this file, can show up in the affidavit supporting the federal warrant, which squeaks by on, like, Layer 2 of Leon. Is that how this works? Well, it's our position that the federal warrant doesn't need to squeak by on Layer 2 of Leon because even if you excise the portion discussing the results of the state search warrant, there's plenty of probable cause there. And the second search warrant provides much more detail than the state warrant did. It discusses the odd parking place. It discusses the jittery demeanor and the pattern of glances we've already gone over. It also discusses attempts. Your Honor, I realize I'm almost out of time. Would you like me to? You can finish up. You are a bit out of time. That's all right. Yes, Your Honor. So it's our position that the federal warrant contains sufficient probable cause even if that portion regarding the state warrant is excised. Thank you, Your Honor. All right. Thank you. Mr. Rosen. Thank you, Your Honor. As far as what McVeigh said, the only reason he asked for the license of my client was because based upon my client's odd behavior, period, nothing about reasonable suspicion that a crime was being committed or about to be committed, odd behavior, period. That's at pages 54, 55 to 56 of his own testimony at the motion hearing. This playground thing, there was a clump of trees. It was 75 feet away. It was a family. There were adults there. It was only a possibility. We're talking about with that state warrant possibility upon possibility. As you indicated, and as Judge St. Eve said, that's not probability. And I think that if we go to the federal warrant, we have fruit of the poisonous tree for anything derived on that. McVeigh said that no crime is being committed. And as far as approaching the car, he thought my client was tweaking. But that even went away because he said he determined it was not. So, therefore, you've got things going away from reasonable suspicion by the time you request the license. And I don't think there was good faith as the state warrant is concerned. I don't know how. McVeigh did the warrant. I just looked it up. He signed. He was the affiant. He was the witness. I don't know how he can say that there was good faith when he's the affiant. Yeah, I don't want to prolong this too much. I think Judge St. Eve's question, though, was, sure, absolutely he's the affiant. He signs it, right? But Leon often asks the question, does it not, the officer that then executes the search, which may or may not be the same as the affiant. So if at the state level McVeigh is the drug guy who had the encounter in the office, he may have given it to the tech people. You're right. And I think that, as I indicated in my reply brief, I think looking at that warrant, the state warrant, I think a reasonable police officer whose experience was safe. That's the argument you need to make. That's not sufficient. Thank you. Thank you very much. And you were appointed, were you not? Yes, I was. Thank you very much for your service to the court and to your client. Thanks as well to the government. We will take the case under advisement and the court will be in recess.